UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2021 MAR 15 PM 1: 10

NILAY KAMAL PATEL and RACHEL A.    )
GLADSTONE,                         )
                                   )
          Plaintiffs,              )
                                   )
    v.                             )        Case No. 5:20-cv-61
                                   )
UNIVERSITY OF VERMONT AND          )
STATE AGRICULTURAL COLLEGE,        )
                                   )
          Defendant.               )

## ORDER ON MOTION TO DISMISS
### (Doc. 11)

In October 1918, Vermont media reported that the "Spanish Influenza" was "spreading rapidly" throughout the state. *The Burlington Free Press & Times*, Oct. 7, 1918, at 8. The media reported on a shortage of health workers, the number of cases and deaths, and relayed advice from the United States Public Health Service, including isolating those with symptoms, use of masks and personal protective equipment when caring for the sick, opening windows for ventilation, and avoiding crowds. The University of Vermont postponed its fall semester. *Id.* Vermont state health officials gave blood to prepare an "anti-toxin" to be administered to university students. *The Burlington Free Press & Times*, Oct. 22, 1918, at 6. The Royall Tyler Theatre—still in use today—was pressed into service as a temporary infirmary.

A century later, a new virus afflicts Vermont and its educational institutions and students. Plaintiffs Nilay Kamal Patel and Rachel A. Gladstone filed this putative class action against the University of Vermont and State Agricultural College ("UVM") on April 21, 2020. (Doc. 1.) Alleging breach of contract and unjust enrichment, Plaintiffs seek "remediation" of UVM's "refusal to provide restitution for tuition, housing, meals, fees, and other applicable costs after

the Plaintiffs and similarly situated students were denied services from UVM due to the Novel Coronavirus Disease of 2019 ('COVID-19') pandemic."  (*Id.* ¶ 1.)  Plaintiffs seek "a refund of all or part of the tuition and fees for which Defendant has been unable to provide the contracted-for services, facilities, access and/or opportunities."  (*Id.* ¶ 5.)  They describe the measure of compensation as "the difference between the value of one half a semester of online learning versus the value of one half a semester of live in-person instruction."  (*Id.* ¶ 56; *see also id.* ¶ 74.)

Currently pending is UVM's motion to dismiss under Fed. R. Civ. P. 12(b)(6).  (Doc. 11; *see also* Doc. 12 (memorandum of law).)  Plaintiffs oppose the motion (Doc. 24) and UVM has filed a reply in support of its motion (Doc. 27).  The court heard argument on the motion on November 6, 2020, and has also considered the cases cited in the parties' subsequently-filed lists of supplemental authorities (Docs. 35, 36, 38, 40, 44, 46, 49, 51, 53, 55).  The court understands that the parties have conferred regarding Plaintiffs' claims for parking and other fees but have been unable to agree about whether UVM has already refunded these fees.  (*See* Doc. 42.)

## Background

Plaintiffs' complaint alleges as follows.  Plaintiffs object to the court's consideration of additional facts that do not appear within the complaint.  The court addresses that dispute in its analysis below.

## I.      Spring Semester 2020 at UVM

Plaintiffs and the putative class members are "individuals who paid either or any combination of the cost of tuition, on-campus housing, meals, and/or fees" for UVM's spring 2020 semester.  (Doc. 1 ¶ 13.)  Spring semester classes at UVM began on January 13, 2020.  (*Id.* ¶ 14.)  Final exams for the semester ended in early May 2020.  (*Id.*)  Prior to the

COVID-19 outbreak, students were scheduled to move out of their residences on May 9, 2020. (*Id.*)

Plaintiffs and the putative class members paid the cost of tuition, on-campus housing, meals, and fees for the semester in spring 2020. (*Id.* ¶ 15.) For 12–19 credit-hours, the tuition cost for UVM's 2019–2020 academic year was $16,392 for an in-state resident and starts at $41,280 for an out-of-state resident. (*Id.* ¶ 16.) Average room and board costs at UVM for the year were $13,354. (*Id.*) UVM also charges a comprehensive fee and parking fees. (*Id.* ¶¶ 17, 38.)

Plaintiffs allege that in exchange for these fees, UVM promised a "unique learning and living environment" and a curriculum for which "only a fraction" involved online instruction. (*See id.* ¶¶ 18, 20.) In support of those propositions, the complaint cites two sources: the UVM undergraduate course catalogue and the UVM website. The UVM undergraduate course catalogue lists a variety of instructional methods, including "Lecture" (LEC), "Independent Study" (IS), "Practicum" (PRAC), "Laboratory" (LAB), "Research" (RSCH), "Hybrid" (HYBD), "Seminar" (SEM), and "Online" (ONL). (*Id.* ¶ 19.) Only a "small fraction" of the listed courses were "online." (*Id.* ¶ 18.)

The UVM website includes the following statement on a page entitled "Campus Life":

What's it like here? It's an intimate and diverse community of thinkers and doers. It's a bustling campus with something always going on. It's an outdoor paradise located in one of America's best college towns. At UVM, we're balanced in mind, body and spirit because UVM students seek out opportunities for work, service and play.

(*Id.* ¶ 20.)[1]  The complaint cites this statement in support of the contention that UVM promises students "a unique learning and living environment."  (*Id.*)

## II.    COVID-19 and UVM's Response

At UVM, spring break for 2020 was from March 8 through 12; most students were not on campus at that time, but they were expecting to return.  (*Id.* ¶ 23.)  On March 11, in response to COVID-19, UVM announced it would be shifting to remote learning starting Wednesday, March 18, and encouraged students not to return to residence halls.  (*See id.*)  The announcement stated that "the university will remain open."  (*Id.*)  On March 23, 2020, UVM announced that remote instruction would continue for the remainder of the spring semester and said that "[u]ndergraduate students who currently reside on campus in the residence halls, as well as non-local students who live off-campus, should return to their homes."  (*Id.* ¶ 24.)  Most UVM buildings were closed and all student activities were canceled for the remainder of the spring 2020 semester.  (*Id.* ¶ 39.)

## III.    Tuition, Housing, Meals, Fees

Members of the putative class have "demanded the return of the unused amounts of funds paid for tuition, for on-campus housing, for meals and for fees, through a number of channels."  (*Id.* ¶ 28.)  But UVM has retained the value of payments made by Plaintiffs and other members of the putative class for tuition, on-campus housing, and meals and fees.  (*Id.* ¶ 25.)  According to Plaintiffs, "UVM has made clear its policy that it will not return any tuition or fees, and will only provide a minimal credit (not a full return of the pro-rated, unused amounts) for housing

---

[1] The complaint lists the URL for this webpage as "https://www.uvm.edu/campus_life."  (*Id.* ¶ 20 n.1.)

and an inadequate future credit for meals." (*Id.* ¶ 28.) Additional allegations regarding each category of expense are set forth below.

### A.   Tuition

UVM did not offer its students a partial refund of tuition "representing the value of the portion of the academic year that they were forced to use online distance learning platforms in lieu of live in-person instruction in brick-and-mortar classrooms." (*Id.* ¶ 30.) According to Plaintiffs, "[s]tudies have shown that students do not perform as well in an online setting such that their grades, as well as their performance in future classes are negatively affected." (*Id.* ¶ 31.) Plaintiffs acknowledge UVM's efforts to continue delivering their education "in some format," but Plaintiffs allege that their "learning experiences have been stymied and disrupted." (*Id.* ¶ 32.) According to Plaintiffs, they did not get "the full benefit of what they bargained for" when they paid tuition for the spring 2020 semester. (*Id.* ¶ 33.)

### B.   On-Campus Housing

The UVM Housing and Meal Plan Contract includes "Terms and Conditions" stating that the University may terminate the contract "[i]n the event of calamity or catastrophe that would make continued operation of student housing infeasible, such as an influenza pandemic." (Doc. 1 ¶ 26.) The "Terms and Conditions" also include the following provision regarding "Emergency Closing":

> In the event that the University of Vermont closes due to a calamity or catastrophe beyond its control that would make continued operation of student housing infeasible, such as a natural disaster, a national security threat, or widespread pandemic flu, room and meal plan fees will not be refunded.

(*Id.* ¶ 27.)

5

UVM offered affected students a "minimal credit (not a full return of the pro-rated, unused amounts) for housing." (Doc. 1 ¶ 28.) UVM offered students a $1,000 credit to their student account if they moved out of their residence hall by March 30, 2020. (*Id.* ¶¶ 24, 35.)

## C.     Meals

Plaintiffs allege that they and members of the putative class paid for on-campus meals and that, after UVM asked students to leave campus in the spring, they lost access to the food being served on campus. (*Id.* ¶ 36.) They allege that UVM "failed to adequately reimburse students with a refund of the amounts paid (on a pro-rated basis) for meals." (*Id.*) As noted above, UVM offered only a "future credit" for meals, which Plaintiffs characterize as inadequate. (*Id.* ¶ 28.) The same Housing and Meal Plan Contract quoted above applies to costs paid for meals.

## D.     Fees

Plaintiffs allege that UVM "failed to offer students a refund of any of the fees they paid for the semester that were unused or for which they had not received a benefit." (Doc. 1 ¶ 37.) According to Plaintiffs, examples of such fees are "the comprehensive fees and parking fees." (*Id.* ¶ 38.)

## Analysis

## I.     Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2). The court must also draw all reasonable inferences in the non-moving party's favor. *Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 150 (2d Cir. 2016). Dismissal is

appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000).

"When deciding a motion to dismiss pursuant to Rule 12(b)(6), courts focus primarily on the allegations in the complaint." *Romano v. Kazacos*, 609 F.3d 512, 520 (2d Cir. 2010). However, the court may also consider materials that are integral to the complaint or that are appropriate for judicial notice. *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006).

## II.   Tuition Claims

Plaintiffs seek tuition refunds on breach-of-contract and unjust-enrichment theories (Counts I and IV). UVM advances three arguments against Plaintiffs' tuition claims. UVM argues that adjudicating the claims would improperly involve the court in matters committed to the discretion of academic institutions. That argument, according to UVM, also precludes Plaintiffs' unjust-enrichment tuition claims. Finally, UVM argues that Plaintiffs' breach-of-contract tuition claims fail because they have failed to plead that the terms of the parties' contract included any promise of in-person educational services.

### A.   Judicial Deference to Academic Decisions

UVM argues that Plaintiffs' tuition claims fail because the claims are premised on an alleged difference in value between in-person and online instruction. It observes that courts generally decline to review the "soundness or effectiveness of a program or method of teaching." *Connors v. Dartmouth Hitchcock Med. Ctr.*, No. 2:10-cv-94, 2013 WL 12221826, at \*3 (D. Vt. Nov. 13, 2013) (citing *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992)). According to UVM, that doctrine is fatal to Plaintiffs' breach-of-contract and unjust-enrichment claims.

7

Plaintiffs maintain that the doctrine of academic deference has never been applied to the types of claims that they are raising.  (Doc. 27 at 8.)  They assert that the doctrine has no application to this case because their claims do not require the court to determine how academic courses should be taught.  Instead, Plaintiffs argue that their claims focus on whether UVM "fail[ed] to deliver on specific promises to provide a specific educational experience."  (*Id.* at 9.)

"[C]ourts accord deference to the decisions of academic institutions about the ethical and academic standards applicable to their students . . . ."  *Connors v. Dartmouth Hitchcock Med. Ctr.*, No. 2:10-cv-94, 2013 WL 3560946, at *6 (D. Vt. July 11, 2013) (citing *Bhatt v. Univ. of Vt.*, 2008 VT 76, ¶ 15, 184 Vt. 195, 958 A.2d 637), *opinion supplemented*, 2013 WL 12221824 (D. Vt. Sept. 16, 2013), *supplemental opinion reconsidered in part*, 2013 WL 12221826 (D. Vt. Nov. 13, 2013).  This doctrine of deference is based upon principles of academic freedom and autonomy long recognized by the courts.  *See Bhatt*, 2008 VT 76, ¶ 15 (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 n.11 (1985)).  The doctrine is frequently invoked to counter claims of "educational malpractice."  *See Connors*, 2013 WL 12221826, at *2–3 (citing cases declining to recognize tort of educational malpractice; noting that such tort claims should be barred because courts "will generally not engage in reviewing the soundness or effectiveness of a program or method of teaching").[2]

---

[2] *See also Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93–94 (2d Cir. 2011) (New York does not recognize "educational malpractice" claims because public policy disfavors court interference with educators' professional judgment); *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206–07 (S.D.N.Y. 1998) ("Where the essence of the complaint is that the school breached its agreement by failing to provide an effective education, the complaint must be dismissed as an impermissible attempt to avoid the rule that there is no claim in New York for 'educational malpractice.'"); *Reilly v. Sw. Vt. Supervisory Union*, No. 152-4-14 Bncv, 2016 WL 6662421, at *12 (Vt. Super. Ct. Mar. 31, 2016) (recognizing that the "educational malpractice" theory of liability has been rejected in other states); Restatement (Third) of Torts: Physical and Emotional Harm § 7 Reporter's Note, cmt. f (2010) ("In the educational-malpractice area, courts have concluded that educators have no duty of care to their students,

But such deference does not extend to all decisions that educational institutions make. Thus, as the court held in *Connors*, academic institutions are not entitled to deference for discriminatory decisions. *Connors*, 2013 WL 3560946, at *6. Of course, this case does not involve any claim of discrimination. But *Connors* also teaches that "[t]he persuasiveness of caselaw rejecting educational malpractice claims diminishes to the extent that [a] claim differs from an educational malpractice claim." *Connors*, 2013 WL 12221826, at *3.

Here, Plaintiffs do not list "educational malpractice" among the legal theories in their complaint; Plaintiffs' causes of action are for breach of contract and unjust enrichment. (Doc. 1 at 1–2.) The court is mindful, however, that "[a]n educational malpractice claim 'repackaged' as a breach of contract claim should be barred under the same reasoning as an educational malpractice case." *Connors*, 2013 WL 12221826, at *3. The court accordingly focuses on the nature of Plaintiffs' claims seeking tuition refunds.

UVM argues that Plaintiffs' tuition claims ask the court to take the "extraordinary" step of holding that the value of remote education is less than the value of in-person education. (Doc. 12 at 1.) In UVM's view, that would require the court to evaluate the quality of the remote education that UVM students received after March 18, 2020, and to pass judgment on educational methods. (*Id.*) According to UVM, the doctrine of deference described above precludes courts from making such inquiries.

The complaint does include allegations that the online learning that UVM provided after March 18, 2020 was not as valuable as in-person learning. (*See* Doc. 1 ¶ 31 (alleging that students do not perform as well in an online setting); *id.* ¶ 32 (alleging that UVM's switch to

---

often because of the administrative difficulties in adjudicating such claims. Problems exist both in sorting out conduct that is innovative or nontraditional as opposed to negligent and in determining the factual cause of a student's educational deficiency.").

online learning "stymied and disrupted" Plaintiffs' "learning experiences").)  And the relief that Plaintiffs seek similarly draws distinctions between the value of online versus in-person education.  (*See id.* ¶ 56 (seeking compensation for "the difference between the value of one half a semester of online learning versus the value of one half a semester of live in-person instruction"); *see also id.* ¶ 74.)

Notwithstanding those allegations, the court concludes that this case differs significantly from an educational-malpractice case.  Plaintiffs' claims do not require the court to review "the soundness or effectiveness of a program or method of teaching." *Connors*, 2013 WL 12221826, at *3.  The essence of Plaintiffs' complaint is not that UVM provided an ineffective education or that Plaintiffs failed to learn the subject matter in their courses or earn academic credits. Plaintiffs are not asking the court to enter the classroom (physical or virtual) and review the course outline, course materials, methods of teaching, or evaluate individual students' academic achievement.  Indeed, Plaintiffs acknowledge UVM's "efforts to continue delivering their education in some format."  (Doc. 1 ¶ 32.)

Instead, Plaintiffs claim that they "did not get the full benefit of what they bargained for when they paid tuition for the Spring 2020 semester."  (*Id.* ¶ 33.)  Reading the complaint in the light most favorable to Plaintiffs, they bargained for in-person instruction and studies with classmates, in-person social interaction, access to UVM buildings and amenities, participation in on-campus student activities, and physical proximity to the City of Burlington and to nearby recreational activities.  They allege that UVM promised them these important aspects of an undergraduate education in its handbook and other publications.  Because it rests upon breach of a promise, Plaintiffs' claim that they did not receive the full benefit of that bargain is different from an educational-malpractice claim.

At this stage, it does not appear that adjudication of Plaintiffs' claim necessarily requires an inquiry into the academic quality of the remote education that Plaintiffs received.  Nor do Plaintiffs' claims violate UVM's academic freedom "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring)).  Courts have no business telling an academic institution that it must employ lectures, seminars, or the Socratic method to teach a particular subject matter.  But a decision to deliver instruction via remote technology is not a decision on "how" the material is taught in the sense that Justice Frankfurter discussed in *Sweezy*.  Nor was UVM's decision in this case made "on academic grounds"; it was instead an administrative decision made to address the exigencies of the COVID-19 pandemic.

Other courts analyzing similar COVID-19-related claims against educational institutions for shifts to online learning have similarly rejected requests for dismissal that were based on court deference to academic freedoms.  *See, e.g.*, *Ford v. Rensselaer Polytechnic Institute*, No. 1:20-CV-470, 2020 WL 7389155, at *6 (N.D.N.Y. Dec. 16, 2020) (concluding that "deference to educational institutions cannot reach so far as to deny students any recourse for breaches of express promises" and that plaintiffs' claims were not "educational malpractice" claims because they argued only that "regardless of fault, the value of the on-campus experience defendant plausibly promised them is greater than the value of the remote experience they received"); *Saroya v. Univ. of the Pac.*, No. 5:20-cv-03196-EJD, 2020 WL 7013598, at *3–5 (N.D. Cal. Nov. 27, 2020) (defendant-university that switched to online learning in response to COVID-19 asserted that plaintiff-students' breach-of-contract and unjust-enrichment tuition claims were fundamentally demands for court intervention in academic decisions and were

11

therefore barred claims for "educational malpractice"; court declined to dismiss claims, reasoning that the claim was not that the university "failed to provide students with an adequate education, but that it failed to provide certain services as promised").[3]

This conclusion distinguishes cases like *Gociman v. Loyola University of Chicago*, No. 20 C 3116, 2021 WL 243573, at *3 (N.D. Ill. Jan. 25, 2021), and *Lindner v. Occidental College*, No. CV 20-8481-JFW(RAOx), 2020 WL 7350212 (C.D. Cal. Dec. 11, 2020).  The courts in those cases found that the theory underlying all of the plaintiffs' claims was that the quality and value of their online education was less than the value of live classes.  *See Gociman*, 2021 WL 243573, at *3; *Lindner*, 2020 WL 7350212, at *7.  This court respectfully declines to follow those cases insofar as they construe the plaintiffs' theories so narrowly.

---

[3] *See also Oyoque v. Depaul Univ.*, No. 20 C 3431, 2021 WL 679231, at *2 (N.D. Ill. Feb. 21, 2021) ("Though portions of the plaintiffs' allegations *can* be read as talking about the value of online instruction, at its core the complaint's focus is breach of contract . . . ."); *Hassan v. Fordham Univ.*, No. 20-CV-3265 (KMW), 2021 WL 293255, at *3 (S.D.N.Y. Jan. 28, 2021) ("The Court holds that Plaintiff's claims are not barred by the educational malpractice doctrine, because they are sufficiently grounded in whether an alleged promise for educational services was made and breached."); *Doe v. Emory Univ.*, No. 1:20-CV-2002-TWT, 2021 WL 358391, at *4 (N.D. Ga. Jan. 22, 2021) ("Because judicial intervention here would not require continuous judicial intrusion, and because a court can properly and justly evaluate the dispute, this Court declines the Defendant's invitation to defer to its decision-making without assessing the merits of the Plaintiffs' claims."); *Hiatt v. Brigham Young Univ.*, No. 1:20-CV-001100-TS, 2021 WL 66298, at *3 (D. Utah Jan. 7, 2021) ("Plaintiff is not asking the Court to interfere in BYU's academic or pedagogical choices by requiring BYU to provide in-person education or change its methods of instruction.  Rather, Plaintiff is asking for a refund of tuition and/or mandatory fees for the breach of contract alleged."); *Garland v. W. Mich. Univ.*, No. 20-000063-MK, 2020 Mich. Ct. Cl. LEXIS 7, at *9–10 (Mich. Ct. Cl. Sept. 15, 2020) (university moved for summary disposition of breach-of-contract and unjust-enrichment claims arising out of university's transition to online learning due to COVID-19; court concluded that allowing claims to proceed would not interfere with academic autonomy); *Waitt v. Kent State Univ.*, No. 2020-00392JD, 2020 Ohio Misc. LEXIS 143, at *3–4 (Ohio Ct. Cl. Sept. 28, 2020) (university moved to dismiss breach-of-contract and unjust-enrichment claims arising out of its decision to close buildings and switch to remote learning due to COVID-19; court concluded that the complaint did not present a claim of "educational malpractice").

**B.      Unjust-Enrichment Claims**

UVM's argument requesting dismissal of Plaintiffs' unjust-enrichment tuition claims is premised on the same academic-freedom considerations.  (*See* Doc. 12 at 13.)  The court will not dismiss those claims on that basis for the reasons stated above.

**C.      Breach-of-Contract Claims—Terms of the Contract**

UVM argues that the materials cited in Plaintiffs' complaint—UVM's course catalogue and website—do not create any actionable promises, and that written disclaimers and reservations of rights in those materials preclude Plaintiffs' tuition claims.  (Doc. 12 at 19.) Plaintiffs maintain that, under Vermont law, the terms of their contract with UVM are contained in a variety of UVM statements, policies, and publications, and that UVM's "disclaimers" and "reservation of rights" defenses do not affect their claims.  (Doc. 24 at 14.)  UVM insists that the disclaimers and reservation-of-rights language in official UVM statements and documents defeat Plaintiffs' tuition claims.  (Doc. 27 at 4–7.)

The court begins with a few general principles:

- the parties do not dispute that Vermont contract law applies.  "Between a student and a college there is a relationship which is contractual in nature."  *Merrow v. Goldberg*, 672 F. Supp. 766, 774 (D. Vt. 1987); *see also Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 708 (D. Vt. 2012) (citing *Reynolds v. Sterling Coll., Inc.*, 170 Vt. 620, 621, 750 A.2d 1020, 1022 (2000) (mem.)); *Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 242 (D. Vt. 1994).

- "The 'terms of the contract are contained in the brochures, course offering bulletins, and other official statements, policies and publications of the

institution.'"  *Reynolds*, 170 Vt. at 621, 750 A.2d at 1022 (quoting *Merrow*,

672 F. Supp. at 774).

- Such a contract is commonly described as "implied-in-fact"—a category long

  recognized in Vermont decisional law.  *See Underhill v. Rutland R. Co.*, 90 Vt.

  462, 98 A. 1017, 1021 (1916) ("Contracts implied in fact are based upon an actual

  agreement of the parties, deduced by the trier from the conduct of the parties and

  the circumstances of the case.")  Section 4 of the Restatement (Second) of

  Contracts also recognizes that contracts "may be inferred wholly or partly from

  conduct."

These principles distinguish *Student "A" v. Hogan*, No. CCB-20-1434, 2021 WL 119083

(D. Md. Jan. 13, 2021), cited by UVM.  The plaintiffs in that case elected not to pursue a breach-

of-implied contract claim.  *Id.* at *2.  The court dismissed their breach-of-*express*-contract claim

because the complaint contained nothing more than speculative assertions of a written contract

that obligated the defendants to provide "in-person housing, meals, and education in exchange

for a specified fee."  *Id.* at *4; *see also Doe v. Emory Univ.*, No. 1:20-CV-2002-TWT, 2021 WL

358391, at *6 (N.D. Ga. Jan. 22, 2021) (finding insufficient allegations to support breach-of-

express-contract claim).  In contrast to *Student "A"*, Plaintiffs in this case are proceeding on a

breach-of-*implied* contract claim.

These general principles defeat UVM's argument that the tuition claims can be dismissed

under Rule 12(b)(6) because the complaint's reference to portions of the UVM course catalogue

and website "do not, on their face, create actionable promises."  (Doc. 12 at 10.)  It is beyond

reasonable dispute that *some* contract exists between UVM and its students.  Which terms may

reasonably be inferred from conduct, including handbooks and course catalogues, is a factual

issue. But in the limited context of a motion to dismiss, the court is obligated to resolve such inferences in favor of the plaintiffs.

In this case, the complaint alleges that the UVM course catalogue distinguishes between "online" and other types of instruction. (Doc. 1 ¶ 19.) The complaint further alleges that "only a small fraction" of the courses listed in the catalogue are billed as "online." (*Id.* ¶ 18.) And the complaint quotes a statement from the "Campus Life" page on the UVM website touting the advantages of a "bustling campus" located in "one of America's best college towns" with opportunities for "work, service and play." (*Id.* ¶ 20.) Drawing all reasonable inferences in Plaintiffs' favor, a factfinder could conclude that UVM promised its students that their academic courses would be largely in-person and that they would receive the benefits of on-campus (and adjacent) facilities and activities.

Courts applying similar law in analogous circumstances have reached the same conclusion. *See, e.g.*, *Doe*, 2021 WL 358391, at *6 ("Defendant's customary practice and the Plaintiffs' payment of tuition represent sufficient factual allegations of mutual assent to an implied contract."); *Bahrani v. Ne. Univ.*, No. 20-10946-RGS, 2020 WL 7774292, at *2 (D. Mass. Dec. 30, 2020) (holding that further factual development was needed to determine whether plaintiffs had a contractual right to in-person instruction); *Ford*, 2020 WL 7389155, at *4 (university's statements in its "Plan"—including commitment to offer a "complete student experience" and benefits from a "residential setting"—was a "specific promise," at least for Rule 12(c) purposes); *Gibson v. Lynn Univ., Inc.*, No. 20-CIV-81173-RAR, 2020 WL 7024463, at *3 (S.D. Fla. Nov. 29, 2020) (rejecting university's argument that complaint lacked allegations of contractual provisions requiring university to provide in-person education or requiring a refund of fees; reasoning that "[t]hroughout the Amended Complaint, Plaintiff cites to portions

15

of Lynn's publications and policies that suggest courses would be conducted in-person and students would have access to campus facilities and activities"); *Saroya*, 2020 WL 7013598, at *5 (allegations of statements in university's course catalogue were sufficient to state a claim for breach of an implied-in-fact contract to deliver courses in-person); *Rosado v. Barry Univ. Inc.*, No. 1:20-CV-21813-JEM, 2020 WL 6438684, at *3 (S.D. Fla. Oct. 30, 2020) (allegations of university documents referring to in-person classes and amenities were sufficient to establish implied contract for in-person instruction); *Salerno v. Fla. S. Coll.*, No. 8:20-cv-1494-30SPF, 2020 WL 5583522, at *5 (M.D. Fla. Sept. 16, 2020) (college publications "clearly implied that courses would be conducted in-person" and touted college's on-campus "resources and facilities"; such statements were sufficient to establish an implied contract).

The cases upon which UVM relies do not compel a contrary conclusion. In *Horrigan v. Eastern Michigan University*, No. 20-000075-MK, 2020 WL 6050534 (Mich. Ct. Cl. Sept. 24, 2020), after the university transitioned to online classes due to the COVID-19 pandemic, student Kevin Horrigan filed a six-count complaint on breach-of-contract and unjust-enrichment theories with respect to payments for tuition, room, and board. He claimed that he had an "express agreement" with the university under which the university agreed to provide live, in-person instruction. *Id.* at *1. The court granted the university's motion for summary disposition for failure to state a claim. On the tuition claim, the court reviewed the written "Tuition Agreement"—which promised "educational services" but did not contain promises about the method of instruction—and concluded that the plaintiff had failed to plead "which service(s) were not received." *Id.* at *4. *Horrigan* is distinguishable because the plaintiff in that case relied on an alleged express agreement—presumably the Tuition Agreement. As discussed above,

16

Plaintiffs in this case rely on Vermont law to argue that the terms of the contract appear in a variety of UVM's statements and give rise to an implied contract.

*Chong v. Northeastern University*, No. 20-10844-RGS, 2020 WL 5847626 (D. Mass. Oct. 1, 2020), is similarly distinguishable. Students in that putative class action case alleged breach of contract and unjust enrichment after Northeastern University retained tuition and fees for spring semester 2020 despite transitioning to online learning in March 2020 due to the COVID-19 pandemic. The plaintiffs argued that their agreement with the university appeared in the written "Financial Responsibility Agreement" (FRA) and that the university breached that agreement when it ceased providing in-person instruction. *Id.* at *2. The court dismissed the breach-of-contract tuition claim, reasoning that the FRA "ties the payment of tuition to registration for courses, not to the receipt of any particular method of course instruction." *Id.* at *3. The court rejected the plaintiffs' attempt to refer to a "semester schedule" to establish contract terms because the plaintiffs had failed to include that allegation in the operative pleading. *Id.* In contrast, Plaintiffs in this case *have* included allegations of university materials that could plausibly establish a contract to provide in-person instruction. *See Ford*, 2020 WL 7389155, at *5 (similarly distinguishing *Chong*).

On this issue, *Oyoque*, *Hassan* and *Lindner*—cited by UVM—are therefore also distinguishable. The court in *Lindner* determined that the plaintiffs "failed to identify any specific language in the 2019–2020 Catalog or any other publication from Occidental that promises in-person instruction." *Id.* at *8. Finding *Lindner* persuasive, the *Hassan* court similarly held that "Fordham's alleged statements do not rise to the level of a specific promise to provide in-person educational services." *Hassan*, 2021 WL 293255, at *6. And the *Oyoque* court held that "none of the facts alleged by the plaintiffs amounts to a concrete contractual

17

promise to provide in-person educational services, experiences, or opportunities." *Oyoque*, 2021 WL 679231, at \*5.  As discussed above, the court concludes that Plaintiffs in this case have identified UVM materials that could plausibly establish a contract for in-person instruction.

UVM notes that "[n]ot all terms in a student handbook are enforceable contractual obligations" and that "courts will only enforce terms that are 'specific and concrete.'" *Knelman*, 898 F. Supp. 2d at 709 (quoting *Reynolds*, 170 Vt. at 621, 750 A.2d at 1022).  Thus "[l]anguage in a college handbook or other official statement that is merely aspirational in nature, or that articulates a general statement of a school's 'ideals,' 'goals,' or 'mission,' is not enforceable." *Id.*  The court agrees with UVM that some of the statements on UVM's "Campus Life" website are not enforceable "specific and concrete" terms.  Plaintiffs cannot enforce statements that UVM's community is comprised of "thinkers and doers" or that the university is "balanced in mind, body and spirit."  But the other statements in the course catalogue and on the website could reasonably be interpreted by a fact finder to form a promise that Plaintiffs' academic courses would be in-person and that Plaintiffs would receive the benefits of on-campus (and adjacent) facilities and activities.

UVM contends that there is additional language in the course catalogue and on the UVM website—language not recited in the complaint—that gave UVM the right to modify how it offered courses to students.  (*See* Doc. 12 at 9.)  That argument leads directly to the parties' disputes over the scope of materials that the court may consider under Rule 12(b)(6).  The court addresses those issues in the context of its review of the specific materials upon which UVM relies.

### 1.     Reservation of Rights in the Course Catalogue

Plaintiffs' complaint explicitly refers to UVM's course catalogue and asserts that the

catalogue "clearly indicates what a student is contracting for when he or she signs up for a

course." (Doc. 1 ¶ 19.)  Although the course catalogue is not attached as an exhibit to the

complaint, the court concludes that it is integral to the complaint and may properly be considered

under Rule 12(b)(6).  *See Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 120 (2d Cir.

2020) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a

[document] upon which it solely relies and which is integral to the complaint, the defendant may

produce the [document] when attacking the complaint for its failure to state a claim." (second

and third alterations in original; quoting *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d

42, 47 (2d Cir. 1991))).  Plaintiffs concede that the complaint refers to statements in the course

catalogue. (Doc. 24 at 8 n.2.)

UVM relies on the following statement in the 2019–2020 UVM Undergraduate

Catalogue: "The University of Vermont reserves the right to make changes in the course

offerings, degree requirements, charges, regulations, and procedures contained herein as

educational and financial considerations require, subject to and consistent with established

procedures and authorizations for making such changes." (Doc. 13-5 at 10.)  According to

UVM, this express reservation of rights defeats Plaintiffs' contention that there was an

enforceable contract for in-person instruction.  (*See* Doc. 12 at 9.)

Plaintiffs argue that, under *Reynolds*, once they began paying tuition, UVM was "no

longer able to unilaterally change the terms of the deal without paying additional consideration."

(Doc. 24 at 15.)  Plaintiffs further assert that the right that UVM reserved is by its own terms a

limited right to make changes required by "educational and financial considerations" and that

neither of those types of considerations applies in this case. (*Id.* at 16.) Finally, Plaintiffs argue that the right reserved by UVM is "subject to and consistent with established procedures and authorizations for making such changes," and that the relevant procedures and authorizations cannot be proven in the present procedural context. (*Id.*)

### a.    *Reynolds*

In *Reynolds*, Sterling College's tuition refund policy appeared in the college's catalogue covering 1994–1996, but included a footnote stating that "At press time, the Tuition Refund policy is under revision to comply with the requirements of the federal Higher Education Amendments of 1992. Please consult the refund policy accompanying all tuition bills or request a copy of the policy in effect during your attendance." *Reynolds*, 170 Vt. at 620, 750 A.2d at 1021. Sterling College student Jay Reynolds voluntary withdrew on January 5, 1996, at which time his mother Betty Reynolds had already paid the college $14,104 out of a total comprehensive fee of $18,167 for the year. Under a new refund policy—a copy of which was delivered to Jay on September 25, 1995—the refund would have been $379. It was undisputed that the refund would have been much larger under the tuition refund policy that appeared in the catalogue. *Id.* at 621, 750 A.2d at 1021–22.

Betty and Jay Reynolds filed suit to obtain a partial refund "under the policy in effect at the time they commenced paying tuition." *Id.* at 620, 750 A.2d at 1021. The Superior Court dismissed Plaintiffs' breach-of-contract and consumer-fraud claims, reasoning that the college "had validly reserved the right to modify its tuition reimbursement policy and had done so." *Id.* The Supreme Court reversed, holding that the contract between the parties gave plaintiffs "the tuition refund rights provided in the catalog once they commenced paying tuition." *Id.* at 622, 750 A.2d at 1023. The Supreme Court also concluded "that a unilateral modification, going to a

specific and definite term like the amount of tuition to be paid, must be supported by consideration." *Id.*

UVM maintains that *Reynolds* does not go so far as to bar universities "from making any modifications to the academic experience after students have paid tuition." (Doc. 27 at 5.)  And UVM argues that *Reynolds* is distinguishable because "the language UVM relies upon was in the Course Catalog at the outset and not the product of any unilateral modification."  (*Id.*)  It is true that, unlike *Reynolds*, there is no indication that at any relevant time UVM was contemplating alteration or did alter the reservation-of-right language in the course catalogue.  But Plaintiffs are not alleging any unilateral modification of *that* language; they claim that UVM cannot rely on that language to unilaterally modify an implied term in the contract that students would receive in-person education and experiences.

Both parties recognize that a contract term which places unilateral authority in one party to alter the terms of the contract may render the contract unenforceable. (*See* Doc. 12 at 9; Doc. 24 at 14–18.)  Such a provision is frequently identified as illusory. *See* Restatement (Second) of Contracts § 77 cmt. a. ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise.").  A promise to provide in-person education, subject to the right to change it without consent of the student, might well qualify as an illusory promise, rendering the contract unenforceable for lack of consideration.

But as we have seen, it is too late in the day to argue that these parties have no contract. They have already created an implied contract through their actions and both—students and university alike—have performed at least in part.  In the case of the students, performance has included full payment of tuition for the semester.  The court cannot declare the contract to be unenforceable just because UVM included language reserving the right to change its

performance in the future. This was precisely the type of one-sided discretion which the Vermont Supreme Court chose not to enforce in *Reynolds*. The court will not enforce UVM's reservation of the right to change its educational program to render the contract unenforceable. The court accordingly finds *Lindner* unpersuasive insofar as the court in that case held that a reservation of rights in the college's course catalog to change fees or modify services defeated the breach-of-implied-contract claim. *Lindner*, 2020 WL 7350212, at *9.

Notably, the reservation of rights is limited in some respects. It is not a reservation of a right to change any aspect of the bargain. It reserves only the right to "make changes in the course offerings, degree requirements, charges, regulations, and procedures contained herein"—i.e., those terms as contained in the course catalogue. (Doc. 13-5 at 10.) And according to Plaintiffs' complaint, the alleged term in the implied-in-fact contract for in-person instruction derives not solely from statements in the course catalogue, but also from statements on UVM's website. If that is true, then the reservation of rights could not include a reservation of a right to alter a term that is derived (at least in part) from outside the course catalogue. *See Hiatt*, 2021 WL 66298, at *3 ("Here, there is insufficient information for the Court to determine whether this disclaimer bars Plaintiff's claim as a matter of law.").

The court's conclusion, therefore, does not mean that educational institutions, or UVM in particular, can make no changes to any aspect of the academic experience after students have begun paying tuition. The court is not holding that UVM would be liable for breach of contract if, for example, due to low enrollment a class listed as a lecture was changed to a seminar, or if due to illness, the listed instructor for a class was replaced with a substitute, or if a campus building is closed due to renovations. And, at the stage of the motion to dismiss, the court is not ruling that UVM has breached the contract in place at the beginning of the semester. The

22

"reservation of rights" language may be admissible as some evidence that the implied contract in place at the start of the semester included authority to adjust the manner of instruction. The court is ruling only that the terms of the implied contract, including discretion to change and adjust to unexpected circumstances, is a fact-bound determination which cannot be determined as a matter of law through dismissal of the complaint.

### b. "Educational and Financial Considerations"

Even if *Reynolds* did not defeat UVM's argument about the reservation-of-rights language in the catalogue, the court concludes that, giving all reasonable inferences to Plaintiffs, the language itself does not necessarily authorize a change to all-remote education. UVM insists that its decision to switch to online instruction was an "educational consideration." (Doc. 27 at 5.) But the court has already concluded that UVM's decision to switch to online learning in spring 2020 was not made on academic grounds but was instead an administrative decision made to address the exigencies of the COVID-19 pandemic. It is unlikely that the "change" to online classes could be said to have been required by "educational" considerations. UVM remains free, of course, to seek to prove at trial that the change to remote learning was "educational" in nature.

### c. "Established Procedures and Authorizations"

The court agrees with Plaintiffs that in ruling on a motion to dismiss, the court cannot rule on the basis of the pleadings that the "change" was consistent with "established procedures and authorizations," since those procedures and authorizations are not listed in or integral to the complaint and do not appear to be proper subjects for judicial notice.

### 2. Disclaimers on the UVM Website

At the bottom of the "Campus Life" webpage cited in the complaint is a hyperlink to UVM's "Privacy/Terms of Use" policy. *Campus Life*, https://www.uvm.edu/campus_life (last

visited Mar. 15, 2021). That hyperlink leads to a webpage listing UVM's website privacy policy and terms of use. *Website Privacy Policy/Terms of Use*, https://www.uvm.edu/compliance/website-privacy-policy/terms-use (last visited Mar. 15, 2021). UVM relies on the following language appearing in the "terms of use" section of that webpage: "This Site is provided as is and as available, without any warranties of any kind, either express or implied. . . . UVM does not represent or warrant that the Site or its content will be accurate, reliable, error-free, or uninterrupted . . . ." *Id.* According to UVM, that language "expressly disclaims all warranties and intent to create a contract." (Doc. 12 at 9.)

The parties disagree over whether the court can properly consider the quoted language under Rule 12(b)(6). Plaintiffs contend that their complaint does not refer to the "terms of use" webpage and that they did not rely on it when they were drafting the complaint. They further assert that there is no indication in the complaint that the webpage might have been incorporated into the parties' contract. (Doc. 24 at 7–8.) And they suggest that the document has not been "authenticated," that the information it contains is not generally known, and that it is "reasonably capable of being questioned." (*Id.* at 7.) UVM maintains that, since the complaint relies on and quotes the UVM website, the "terms of use" webpage may properly be considered. (*See* Doc. 12 at 4 n.3.)

The court concludes that it is irrelevant whether Plaintiffs relied on the "terms of use" webpage when drafting the complaint. Since the webpage is a publicly available UVM policy statement, the court may take notice of it. *See Force v. Facebook, Inc.*, 934 F.3d 53, 59 n.5 (2d Cir. 2019) (since their authenticity was not in question, Facebook's publicly-available terms of service were subject to judicial notice); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 234 (2d Cir. 2016) (Amazon.com "Order Page" and "2012 Conditions of Use," although not attached

to the complaint, were "part of the contract incorporated into the complaint by reference");

*Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 263 n.5 (S.D.N.Y. 2018) ("Courts may take judicial

notice of public[ly] available websites when the authenticity is not in dispute."). Plaintiffs do not

elaborate on their assertion that UVM's "terms of use" webpage has not been authenticated, the

information therein is "not generally known," and that it is "reasonably capable of being

questioned." (Doc. 24 at 7.) The court need not address such "boilerplate" evidentiary

objections. *See Granlund v. Burbank Hill Cmty. Ass'n*, No. SACV 19-01439JVS(KESx),

2020 WL 5498075, at *4 (C.D. Cal. Aug. 5, 2020) (additionally noting that "[c]ourts have found

it proper to take judicial notice of a party's own website pursuant to Fed. R. Evid. 201").

Apart from their argument that the court should not even consider the "terms of use"

webpage, Plaintiffs advance two arguments for their position that the disclaimers on that page do

not aid UVM. First, they assert that, notwithstanding the disclaimers, the statements on the

"Campus Life" webpage "were published by Defendant, and therefore, are considered part of its

contract with Plaintiffs as a matter of law" under *Reynolds* and other cases. (Doc. 24 at 17.)

Second, Plaintiffs argue that the disclaimers on the "terms of use" webpage are unenforceable

"browsewrap" agreements. *(See id.* at 17–18.)

In contrast to "clickwraps"—which typically require users to click an "I agree" box after

being presented with a list of terms or conditions of use—"browsewrap" agreements "involve

terms and conditions posted via hyperlink, commonly at the bottom of the screen, and do not

request an express manifestation of assent." *Nicosia*, 834 F.3d at 233. "In determining the

validity of browsewrap agreements, courts often consider whether a website user has actual or

constructive notice of the conditions." *Id.* "Whether there was notice of the existence of

additional contract terms presented on a webpage depends heavily on whether the design and content of that webpage rendered the existence of terms reasonably conspicuous." *Id.*

The court concludes that is unnecessary to perform that "reasonably conspicuous" inquiry. The quoted language cannot bar consideration of the statements on the "campus life" webpage in determining the terms of the parties' contract. All of the statements on the "terms of use" webpage that UVM quotes—that the UVM website is provided "as is and as available," the disclaimer of "warranties of any kind," and the statement that "UVM does not represent or warrant that the Site or its content will be accurate, reliable, error-free, or uninterrupted"—relate to the performance or functionality of the website, not the *legal effect* that statements on the website may have on the terms of the contract between UVM and UVM students.

For all of the above reasons, the court concludes that UVM has failed to show any basis for dismissal of Plaintiffs' breach-of-contract and unjust-enrichment claims for tuition refunds.

## III.    Housing and Meal Claims

Plaintiffs seek refunds of sums they paid for housing (Counts II and V) and meals (portions of Counts III and VI) on breach-of-contract and unjust-enrichment theories. UVM argues that those claims should be dismissed because of exculpatory provisions and reservations-of-rights in the Housing and Meal Plan Contract. Plaintiffs do not dispute that the complaint refers to statements in the Housing and Meal Plan Contract. (*See* Doc. 24 at 8 n.2.) The court proceeds to examine the language upon which UVM relies, beginning with the "Emergency Closing" provision referenced in the complaint. (Doc. 1 ¶¶ 26–27.)

As noted above, the "Emergency Closing" provision in the Housing and Meal Plan Contract states:

> In the event that the University of Vermont closes due to a calamity or catastrophe
> beyond its control that would make continued operation of student housing

infeasible, such as a natural disaster, a national security threat, or widespread pandemic flu, room and meal plan fees will not be refunded.

(*Id.* ¶ 27.) In opposition to Plaintiffs' assertion that UVM "has not closed" (Doc. 1 ¶ 27) and that the "Emergency Closing" provision does not apply, UVM maintains that the provision refers to UVM's physical campus and that UVM "did in fact effectively close." (Doc. 12 at 15.)  In support of the latter proposition, UVM points to instances in the complaint itself where Plaintiffs allege that UVM "was effectively closed" (Doc. 1 ¶ 36) and that "most UVM buildings were closed" (*id.* ¶ 39).  In support of the former proposition, UVM argues that the "Emergency Closing" provision's language necessarily refers to closure of the physical campus because that provision appears in the context of a contract for housing and dining facilities—i.e., physical facilities.

The goal of courts interpreting contracts governed by Vermont law is "to effectuate the parties' intent as expressed in their writing, according, whenever possible, to the plain meaning of the contract language." *Besaw, Trustee of Revocable Living Trust of Ernest P. Giroux v. Giroux*, 2018 VT 138, ¶ 21, 209 Vt. 388, 205 A.3d 518.  The court endeavors to "'form a harmonious whole from the parts,' recognizing that 'an interpretation which harmonizes all parts of the contract is preferable to an interpretation which focuses on one provision heedless of context.'" *Id.* ¶ 27 (quoting *In re Verderber*, 173 Vt. 612, 615, 795 A.2d 1157, 1161–62 (2002) (mem.)).  Only if the language is ambiguous—"meaning that reasonable people could understand it differently"—does the court look beyond the four corners of the writing to understand its meaning. *Sutton v. Vt. Reg'l Ctr.*, 2019 VT 71A, ¶ 66, 238 A.3d 608.

Because Plaintiffs concede that the complaint expressly refers to statements in the Housing and Meal Plan Contract (Doc. 24 at 8 n.2), the court has reviewed the full text of the contract that appears in the record at Document 13-6. The Housing and Meal Plan Contract does

not include any separate "definitions" section defining "closure" for purposes of the "Emergency Closing" provision. And the provision's reference to "the University of Vermont" closing is not a model of clarity—read in isolation, that phrase might suggest closure of the entire campus and all university functions and operations.

But when read in context of the full "Emergency Closing" provision, the court concludes that "closure" unambiguously refers to closure of the facilities necessary to provide student housing and meals. The subsequent text specifies that the "closure" must be "due to a calamity or catastrophe beyond [UVM's] control that would make continued operation of student housing infeasible, such as . . . widespread pandemic flu." (Doc. 1 ¶ 27.) In addition, this provision appears in a contract that pertains to housing and meals; that fact provides further support for the conclusion that the relevant "closure" is closure of UVM's housing and food-service facilities.

This conclusion makes it unnecessary to consider or review the other provisions that UVM has cited. UVM is entitled to dismissal of Plaintiffs' breach-of-contract claims for room and meal plan fees because the "Emergency Closing" provision in the parties' contract unambiguously specifies that such fees will not be refunded in the circumstances that are present here. As part of an express contract on the subject matter, the "Emergency Closing" provision is "highly relevant in determining whether denying further payment . . . is unjust." *Kwon v. Edson*, 2019 VT 59, ¶ 57, 217 A.3d 935 (alteration in original) (quoting *DJ Painting, Inc. v. Baraw Enters., Inc.*, 172 Vt. 239, 243, 776 A.2d 413, 417 (2001)). The court concludes that this contractual language specifically allocated the risk of loss due to widespread pandemic flu, and therefore denying further payment (or refund) of these costs is not unjust. UVM is therefore also entitled to dismissal of Plaintiffs' unjust-enrichment claims for room and meal plan fees.

## IV.     Fee Claims

Finally, Plaintiffs allege that UVM "failed to offer students a refund of any of the fees they paid for the semester that were unused or for which they had not received a benefit." (Doc. 1 ¶ 37.)  According to Plaintiffs, examples of such fees are "the comprehensive fees and parking fees."  (*Id.* ¶ 38.)  Plaintiffs seek compensation for the fees paid on breach-of-contract and unjust-enrichment theories (portions of Counts III and VI).

UVM argues that Plaintiffs have failed to state a plausible claim for refund of either a "parking" fee or a "comprehensive" fee.  (Doc. 12 at 17.)  As to the parking fee, UVM asserts that Plaintiffs have alleged only that "students" paid such fees without receiving a refund, but that the named plaintiffs, Nilay Patel and Rachel Gladstone, have not alleged that they are among that group of students.  Regarding the comprehensive fee, UVM maintains that it continued to provide instruction and course credit in the second half of the spring 2020 semester, and that Plaintiffs have not alleged that UVM charges a different comprehensive fee depending on whether students are enrolled in online or in-person classes.  (*Id.* at 17–18.)

### A.     Parking Fees

In their opposition brief, Plaintiffs assert that they "did, in fact, make [the] allegation" that they paid parking fees for the spring 2020 semester.  (Doc. 24 at 26.)  UVM encourages the court to refer to correspondence between the parties in the weeks after Plaintiffs' opposition brief related to the issue of parking fees.  (*See* Doc. 28.)  The court declines that invitation and confines itself to reviewing the allegations in the complaint.  The court proceeds to consider UVM's argument that the complaint lacks allegations that Nilay Patel and Rachel Gladstone personally paid any parking fees, and that the absence of such allegations defeats their claim

under Vermont law and any claim they might have to standing as class representatives.

(*See* Doc. 27 at 10.)

In the court's view, it is unclear from the text of the complaint alone whether Nilay Patel and Rachel Gladstone paid parking fees for the spring 2020 semester. Since UVM's argument depends on its reading of the complaint as lacking allegations that they paid such fees, the court concludes that it is preferable to get clarification before delving into the legal issues that UVM raises. The court accordingly directs Plaintiffs to provide a more definite statement within 10 days as to their parking-fee claims that specifically indicates whether Nilay Patel and Rachel Gladstone (or anyone on their behalf) paid parking fees for UVM's spring 2020 semester. *See Straker v. Metropolitan Transit Auth.*, 333 F. Supp. 2d 91, 103 (E.D.N.Y. 2004) (court may order more definite statement under Fed. R. Civ. P. 12(e) on its own initiative).

## B. Comprehensive Fee

UVM argues that Plaintiffs' comprehensive-fee claim is not plausible for two reasons. First, UVM asserts that the complaint does not allege that UVM stopped providing instruction or course credit and does not include any allegation as to whether UVM charges a different comprehensive fee depending on whether students are enrolled in online or in-person classes. (*See* Doc. 12 at 17.) Second, UVM asserts that the court should consider UVM's "Refund and Bill Adjustment Policy," which according to UVM provides for no refunds after more than 14 days following the semester add/drop deadline. (Doc. 12 at 18; *see also* Doc. 13-7 (copy of purported policy).)

The court rejects UVM's contention in its reply that Plaintiffs have waived their comprehensive-fee claims by failing to respond to UVM's arguments on that issue. (*See* Doc. 27 at 9.) In their opposition brief, Plaintiffs object to the court's consideration of the "Refund and

Bill Adjustment Policy" in the Rule 12(b)(6) context; they suggest that the policy has "not been

authenticated"; that the policy "is not generally known"; and that the source is "reasonably

capable of being questioned." (Doc. 24 at 7.) And Plaintiffs insist that they have stated plausible

claims for refund of the comprehensive fee (or a portion of it) because "most UVM buildings

were closed, and all student activities were canceled for the remainder of the Spring 2020

semester." (*Id.* at 26.)

The court concludes that it may properly take notice of the UVM "Refund and Bill

Adjustment Policy" for the same reasons that it may properly take notice of UVM's "terms of

use" webpage. *See supra.* The policy sets a schedule for refund of the comprehensive fee in

cases where a student cancels or withdraws from UVM, is suspended, or dismissed. (Doc. 13-7

at 2.) Plaintiffs do not allege that any of those circumstances are present here. No other

provision in the "Refund and Bill Adjustment Policy" indicates that a refund might be available

save for the following:

Emergency Provisions

> The University of Vermont[] reserves the right, in the case of natural disaster,
> pandemic flu or other acts of God, where the University must cease operation for a
> single semester or significant portion of a semester, to modify this existing policy.
> The modified refund policy would be determined by the University administration
> and approved by the Board of Trustees.

(*Id.* at 4.) Here, even assuming that UVM "cease[d] operation" under that provision, the

complaint includes no allegations that the comprehensive fee refund policy was modified.

Presumably if it had been modified in Plaintiffs' favor, Plaintiffs would not be bringing the

comprehensive-fee claim. Absent such modification, the court concludes that the "Refund and

Bill Adjustment Policy"—like the Housing and Meal Plan Contract—is integral to the parties'

contract and unambiguously specifies that the comprehensive fee will not be refunded in the

circumstances that are present here. The court similarly concludes that this provision allocated

the risk of loss due to widespread pandemic flu, and denying a refund of the comprehensive fee

is not unjust.  UVM is entitled to dismissal of Plaintiffs' breach-of-contract and unjust-

enrichment claims for the comprehensive fee.[4]

### Conclusion

UVM's Motion to Dismiss (Doc. 11) is GRANTED IN PART, DENIED IN PART, and

RESERVED IN PART.  UVM has failed to show any basis for dismissal of Plaintiffs' breach-of-

contract and unjust-enrichment claims for tuition refunds (Counts I and IV).  UVM is entitled to

dismissal of Plaintiffs' breach-of-contract and unjust-enrichment claims for housing (Counts II

and V) and meal plan refunds (the portions of Counts III and VI concerning amounts paid for

meals).  UVM is also entitled to dismissal of the portions of Counts III and VI that concern the

comprehensive fee.  The court reserves ruling on the portions of Counts III and VI that concern

parking fees, and directs Plaintiffs to provide a more definite statement within 10 days as to

those claims that specifically indicates whether Nilay Patel and Rachel Gladstone (or anyone on

their behalf) paid parking fees for UVM's spring 2020 semester.

Dated at Burlington, in the District of Vermont, this 15th day of March, 2021.

Geoffrey W. Crawford, Chief Judge
United States District Court

---

[4] The policy also has potential application to tuition refund claims.  This issue was not addressed by the parties.